# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **In re**<br><br>**MARK J. GILLIS,**<br><br>           **Debtor** | **Chapter 7**<br>**Case No. 04-18893-RS** |

## MEMORANDUM OF DECISION AND ORDER ON OBJECTION OF
## MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.
## TO CONFIRMATION OF CHAPTER 13 PLAN

The Debtor, Mark J. Gillis, has proposed a Chapter 13 plan that would, among other things, cure a $38,000 arrearage on his home mortgage. He would fund the $93,430 cost of the plan largely through a balloon payment of $75,930.00, to be paid upon the refinancing or sale of his home in the last month of this 36-month plan. The mortgagee, Mortgage Electronic Registration Systems, Inc. (" MERS"), has objected to confirmation of the plan, arguing that Chapter 13 prohibits balloon payments in "cure and maintain" plans as a matter of law. For the reasons set forth below, the Court disagrees and, finding that the plan is permitted and feasible, and that it cures the arrearage to MERS within a reasonable time, now overrules the objection.

## Procedural History

The Debtor filed a petition for relief under Chapter 13 of the Bankruptcy Code on November 3, 2004, thereby commencing this case. With his petition, he filed a Chapter 13 plan having a term of thirty-six months. Among other things, the plan provides that the Debtor will cure an arrearage quantified at $38,000 on a mortgage held by MERS[1] and that the Debtor will

---

[1] The plan identifies the mortgagee as Chase Manhattan, but the Debtor does not disagree that MERS is the current holder of the mortgage. Also, though the plan quantifies the arrearage at $38,000, MERS has filed a proof of claim which states that the arrearage is $39,958.60; nonetheless, MERS has not objected to the plan's quantification of the arrearage.

continue to make regular monthly payments on the mortgage directly to the mortgagee. The plan

makes provision to pay secured debt totaling $40,170 (all arrearages), priority claims totaling

$32,982, an administrative claim of $1,109, and a ten percent dividend on unsecured debt of

approximately $90,000. The total cost of the plan, including the fee to the Chapter 13 Trustee, is

$93,430. The plan states that the Debtor will fund this sum by making monthly plan payments of

$500 per month for 35 months and a lump-sum ("balloon") payment of $75,930 in the thirty-

sixth month. The Debtor would fund the balloon payment by refinancing his home (the property

subject to the MERS mortgage) or, if necessary, selling the same property.

MERS filed an objection to the plan, stating that the balloon feature "is an impermissible

modification of the claim" and unfairly delays payment of half the arrearage until the thirty-sixth

month with no additional compensation. MERS also argued that the Debtor had not shown that

the balloon payment was feasible or justified.[2] In a subsequent brief in support of its provision,

MERS expanded on these initial statements with four specific arguments of law. First, as a

matter of law, a debtor who cannot repay his or her prepetition claims without a balloon payment

is not an "individual with regular income" within the meaning of § 101(30) for the purposes of

qualifying as a Chapter 13 debtor. Second, balloon payments in standard "maintain and cure"

plans[3] violate § 1322(d) (prohibiting payments over longer than three years or, for cause, up to

--------------------------------------------------------

[2] The United States, by the Internal Revenue Service, also objected to the plan, stating
that the plan did not make provision for the full amount of its claim; notably, the IRS contends
that its priority claim exceeds the plan's quantification of that claim by approximately $10,000.
A preliminary hearing on that objection was continued generally at the parties' request and
remains pending.

[3] MERS is referring to a plan that treats a claim secured only by a mortgage on the
debtor's principal residence in accordance with 11 U.S.C. § 1322(b)(5). In relevant part, that
subsection states that, notwithstanding § 1322(b)(2)'s prohibition against a plan's modifying the
rights of those secured claims secured only by a security interest in the debtor's principal
residence, "a plan may . . . provide for the curing of any default [on such a claim] within a

2

five years).  Third, balloon payments in maintain and cure plans fail to satisfy the feasibility

requirements of § 1325(a)(6.  And fourth, balloon payments in maintain and cure plans violate §

1322(b)(5) itself, the subsection that permits curing of any default within a reasonable time and

maintenance of payments while the case is pending.  In response, the Debtor's position is simply

that the Bankruptcy Code does not categorically preclude reliance on balloon payments and that

the proposed balloon payment in his plan is feasible.

　　　　After a preliminary hearing on the objection, the Court received briefs on the legal issues

and held an evidentiary hearing.  At the Court's request, the parties also filed an agreed statement

as to the precise amount owed on the mortgage to MERS.


## Findings of Fact

　　　　The Debtor and his wife, who is not a debtor in this case, own the real property located at

237 Forest Street, Reading, Massachusetts ("the property"), a single-family home in which they

reside with their three young children.  The Debtor and his wife acquired the property in October

1994 for the price of $234,0000.  In 2002, they commenced a significant remodeling project on the

home that they had expected would cost $142,000.  The project is now completed, but

unanticipated events and complications increased the cost to approximately $300,000.

Compounding the couple's difficulties, in October 2002, the Debtor's wife lost her full-time job,

in which she had been earning $49,000 per year.  Despite these setbacks, they managed to

refinance their home in November, 2003, with a mortgage loan (the mortgage now held by

MERS) in the original principal amount of $536,200.00.  Still, the increased cost of the

---

reasonable time and maintenance of payments while the case is pending." 11 U.S.C. §
1322(b)(5).

renovation project and the loss of the wife's income landed the couple in financial distress. The

Debtor explained, "I was faced with the Hobson's choice of either paying Chase or paying

contractors to make my house liveable for my family." They paid the contractors and got the

project finished but, in doing so, fell significantly into arrears on their mortgage payments; their

loan agreement required monthly payments during that period in the amount of $4,435.80. By

the time of the bankruptcy filing in November 2004, the couple was $39,958 in arrears on their

mortgage[4] and facing foreclosure.

The Debtor estimates that the fair market value of the property was $780,000 at the time

of his bankruptcy filing and, with postpetition appreciation, $800,000 as of the date of the

hearing (May 5, 2005). Though he is not a real estate appraiser, he is well-informed about his

own property, property values in the Town of Reading in general, and trends and factors in that

market. His estimate is based in part on an appraisal commissioned by the mortgage broker

through whom he obtained the MERS mortgage; under that appraisal, the fair market value of the

property was $705,000 in September, 2003. Though that appraisal is not itself in evidence, I find

the value it settles upon to be consistent with the decision by MERS's predecessor in interest to

lend $536,000 against that property some two months later. Therefore, I accept the figure of

$705,000 as a reasonable and trustworthy benchmark for the fair market value of the property in

the fall of 2003.

The Debtor further testified that, when the appraisal was conducted, the renovation of the

property was incomplete, and that another $48,000 of work was done afterward, further

increasing the property's value to approximately $750,000 upon completion of the renovations in

---

[4] The Debtor's Chapter 13 plan quantifies the arrearage at $38,000. In its objection to confirmation, MERS does not dispute that figure. At the evidentiary hearing on the objection, however, the parties stipulated that, as of the date of the filing, the arrearage was $39,958.60.

early 2004. The Debtor then adjusted the value upward to $780,000 and $800,000 in conformity

with the general increase in real estate values in the metropolitan Boston area over the last year.

MERS offered no evidence of its own on value and has not taken a position on the issue.

MERS cross-examined the Debtor with respect to his evidence of value but exposed no weakness

in it. That evidence was fundamentally sound, as was the valuation it supports; accordingly, I

find that the fair market value as of the date of the bankruptcy filing was $780,000.

The property is encumbered only by the mortgage in favor of MERS, on which the

balance owing is $600,511.93 (as of May 5, 2005). The Debtor has fallen into arrears on his real

estate tax obligations, but MERS has made advances to cover that arrearage, and those advances

are reflected in MERS's secured claim. There is no evidence of a separate lien in favor of the

Town.

Therefore, MERS is protected by an equity cushion of at least $180,000 as of the date of

the bankruptcy filing. This cushion is likely to increase postpetition with appreciation in the

value of the property (attributable entirely to the general and continuing trend in housing values

in this area) and with modest reduction in the debt from payments on the arrearage through the

plan and, to a lesser extent, from regular postpetition payments insofar as they are allotted to

principal.

The Debtor, a self-employed attorney, averages income of approximately $7,826 per

month (after business expenses). His income is secure and likely to hold steady or to increase

modestly over the term of the plan. Though secure, the Debtor's income is nonetheless

somewhat erratic, owing to the irregular payment schedule of the governmental entities who pay

for, or authorize payment for, his services and thereby represent a substantial portion of his

income. Because his income is irregular, the Debtor has historically relied on savings or reserves

to enable him to remain curr ent with creditors while awaiting income from his account debtors. The events that precipitated  his bankruptcy filing have depleted his reserves, and consequently the Debtor temporarily fell i to arrears on his payments to the Chapter 13 Trustee, but now has cured the arrearage. As rese rves slowly increase again, the Debtor's postpetition payments to the Trustee and to MERS will l kely become regular.

The Debtor's wife is now employed part-time as an independent sales consultant, earning $774 per month ($180 per v eek). Total monthly household income is therefore $8,600. The Debtor and his wife have re sonable and necessary monthly expenses of $8,100, leaving excess income of $500 per month t  devote to the Chapter 13 plan. They do not anticipate a substantial change in this situation ove  the three-year term of the plan, except that the Debtor's wife expects to return to full-time emplo ment in the fall of 2006, when the couple's youngest child starts kindergarten.

In order to complete their Chapter 13 plan, the Debtors will have to pay the balance owing on the plan in its thir y-sixth month, $75,930.[5] In order to finance this payment, they will have to refinance their hom , which will in turn require payment in full of the MERS mortgage. Payment in full of the mort age balance will include payment of the $38,000 arrearage, which is also part of the cost of the p an and should not be paid twice. Therefore, the total that the Debtor will have to borrow is the b lance owing on the mortgage ($600,511.93[6]), plus the balance then

---

[5] This balance, $75 930, equals the total cost of the plan, $93,430, minus the sum of the monthly payments required in the interim, $17,500 (35 monthly payments of $500).

[6] This amount may  ave to be adjusted to reflect (1) postpetition reductions in principal (from regular monthly post etition payments to MERS over the term of the plan), (2) payments on the arrearage through th  plan, and (3) postpetition charges for MERS's attorney's fees and other costs. Absent signific ant attorney's fees, which are unlikely here, the net effect will be a modest reduction of the bal nce, and therefore the figure cited is conservative.

owing on the plan ($75,930) less the amount of the arrearage as quantified by the plan

($38,000): a total borrowing of $638,441.93.

The Debtor presented credible evidence, the testimony of a mortgage broker who

specializes in loans to Chapter 13 debtors, that financing is available for Chapter 13 debtors

seeking to refinance their homes in order to complete their Chapter 13 plans, provided they meet

three requirements. First, the amount of the loan being sought must not exceed eighty-five

percent of the value of the property securing it (the "loan-to-value requirement"). Second, the

amount of the monthly payment required by the loan, together with the monthly burden of

property taxes and insurance, must not exceed fifty percent of the borrowers' gross monthly

income. Third, the borrowers must have made payments on their existing mortgage on a timely

basis throughout the twelve-month period immediately preceding qualification for the loan. A

loan under this program would be a thirty-year loan having a rate of interest that is fixed in the

first two years and variable thereafter. The rate in the first two years would be fixed at one

percentage point lower than what would be available on a thirty-year fixed rate loan.

The Debtor has established that he will likely be able to satisfy the loan-to-value

requirement. For a refinancing in the amount of $638,441.93, this requirement will be satisfied if

the fair market value exceeds $750,807.71. The property already exceeds that value and will

likely appreciate further over the term of the plan.

The second requirement for mortgage qualification was that monthly principal, interest,

taxes, and insurance (PIT&I) not exceed fifty percent of the borrowers' gross monthly income.

With respect to income, the Debtor and his wife currently have gross monthly income of $8,600.

This figure includes the Debtor's wife's income from part-time employment of $774 per month.

The Debtor's wife intends to return to full-time work in the fall of 2006. Before losing her full-

time job in the fall of 2002, he had been employed as the senior writer in the marketing

department at Blue Cross/Blue Shield, earning $49,000 per year. It is reasonable to expect that

she will return to that salary level before the summer or fall of 2007, when the couple applied for

the financing needed to fund the balloon payment. Even if she only earned $40,000 per year

($3,333.33 per month) in her full-time employment and the Debtor's own income of $7,826 did

not increase at all—conservative estimates both—monthly household income would total

$11,159.33.

Under the loan program of which the Debtor submitted evidence, this would permit the

couple to qualify for monthly payments of PIT&I totaling up to $5,580 (50% of $11,159.33).

The Debtor submitted uncontroverted evidence that real estate taxes on the property are currently

$600 per month and that property insurance currently costs $500 per year, or $42 per month.

Therefore, taxes and insurance together currently total $642 per month; adjusting for inflation

over the three years of the plan, these would total approximately $700 by the time of the

refinancing, leaving $4,880 for principal and interest.

Would this permit the Debtor and his wife to borrow the $638,441.93 that would be

needed to pay off the MERS mortgage and make the balloon payment on the plan? The loan in

question would involve borrowing $638,441.93 and repaying it over thirty years with a fixed rate

in the first two years and a variable rate thereafter. The Debtor presented evidence that

applicants under this program were currently being approved for refinancing at initial interest

rates of 6.3 and 6.5 percent per annum. At 6.5 percent, monthly payments on a 30-year loan of

$638,441.93 would be $4,035.38; at 7.5 percent, $4,464.07; at 8.25 percent, $4,796.40; and at 8.5

percent, $4,909.06. I conclude that the Debtor and his wife are reasonably likely to be able to

satisfy the program's payment-to-income ratio.

## Discussion

MERS makes four a guments as to why confirmation of the proposed plan should be denied as a matter of law. T he Court will first address these four as challenges to balloon plans in general and, with respect o the challenges under § 1325(a)(6) (feasibility) and § 1322(b)(5) (reasonable time to cure), as challenges to this particular balloon plan.

### 1.   The "Regula r Income" Test

In order to qualify fc : relief under Chapter 13 of the Bankruptcy Code, a debtor must be "an individual with regular i ncome." 11 U.S.C. § 109(e) (eligibility to be a debtor under Chapter 13). In relevant part, the Ba ikruptcy Code defines "individual with regular income" as "individual whose income i: sufficiently stable and regular to enable such individual to make payments under a plan unde chapter 13 of this title." 11 U.S.C. § 101(30) (definition of "individual with regular inc me"). MERS first argues that 11 U.S.C. § 109(e), in limiting eligibility for Chapter 13 to in individual "with regular income," actually requires not only that the Debtor have stable and r gular income, but that such regular and stable income be sufficient in amount to fund the plan v ithout recourse to supplemental sources of funding.[7]

This argument reads more into § 109(e) than it says. Subsection 109(e), in conjunction

---

[7] The cases that ME RS cites in support of this proposition are inapposite. Each involved a plan that relied exclusivel' on future earnings or other income without recourse to a balloon payment. See In re Hickma i, 104 B.R. 374 (Bankr.D.Colo. 1989) (plan that relied solely on flow of income was unconfirmab e because income flow was neither reliable nor reasonably certain as to amount) and In re Fische , 103 B.R. 44, 49 (Bankr.N.D.N.Y. 1989) (monthly plan contributions from unrelatec third party deemed too tenuous to satisfy stability requirement of § 109(e)). Confirmation was lenied in these cases because future income, which was the *only* source of funding in each ca ;e, was not sufficiently reliable and regular to enable the debtor to make the payments required to fund the plan. These cases did not address the issue presented here: whether § 109(e) requ res that future income be sufficient in amount to fund the plan without recourse to a balloo i payment from sale or refinancing of assets.

with the definition in § 101( 30), requires that a Chapter 13 debtor have income that is sufficiently

stable and regular to enable  he individual to make payments under a plan.  Although the

definition in § 101(30) conte mplates "payments under a plan," in no way does it dictate how

large those payments need b :.  It does not say "*all* payments under a plan."  In fact, if § 109(e)

were construed as MERS no v proposes, it would directly contradict § 1322(b)(8) of the

Bankruptcy Code, which ex ressly permits a Chapter 13 plan to "provide for the payment of all

or part of a claim against the debtor from property of the estate or property of the debtor."  11

U.S.C. § 1322(b)(8).  The C urt is satisfied that the requirement of regular income in § 109(e) is

not a mandate that the debto 's income be sufficient in *amount*, by itself, to fully fund the plan

(or any specific portion ther of).

## 2. Section 1322(a) ; nd (d)

MERS next argues tl at subsections 1322(a) and (d) show a legislative intent not to permit

balloon payments.  Specific: lly, Congress mandated that all of a Debtor's projected disposable

income be devoted to a plan for a period of three years, and permitted extension of this period to

five years upon a showing o cause.  11 U.S.C. § 1322(a) and (d).  The ability to repay by a

balloon payment, contends N IERS, defeats the purpose of the extension permitted by § 1322(d).

MERS further argues that th ; requirement in § 1322(a) that all of a debtor's disposable income

be devoted to the plan preclu des the possibility of the debtor's saving money over the term of the

plan.

Again, MERS is reac ing more into the language of § 1322(a) and (d) than these

subsections actually and plai nly say.  None of the language in either subsection prohibits

alternate sources of plan fun ling; nor does such language expressly or implicitly require that *all*

10

plan funding be derived from wages and salary.  Subsection (a) requires submission of "future

earnings *or other future income*."  11 U.S.C. § 1322(a)(1).  A gain from sale or refinancing of

property is income within the scope of this section.  Moreover, even if the excess proceeds of a

refinancing were not income within the scope of § 1322(a)(1), that subsection requires

submission of only such future earnings or income "as is necessary for the execution of the plan."

To the extent that the plan is funded from other sources, such as the sale or refinancing of

property, future earnings and income are not necessary for the plan's execution and,

consequently, not required by § 1322(a)(1).  As for subsection (d), it merely permits extension of

the plan period for cause.  It plainly does not prohibit funding of the plan from sources other than

wages and salary.  Especially in view § 1322(b)(8) (permitting payment of claims from assets of

the estate and of the debtor)  it does not evince congressional intent to preclude funding from sale

or refinancing of assets.


### 3. Feasibility under § 1325(a)(6)

MERS next argues that the feasibility requirement in § 1325(a)(6) is one that a balloon

plan, by its nature, can *never* satisfy.  Section 1325(a)(6) permits confirmation of the plan only if

the debtor will be able to effectuate it, to make the payments it requires.  A balloon plan is

inherently based on the supposition that there will be sufficient equity in the property at the end

of the plan term, three to five years from commencement of the case, to permit the sale or

refinancing necessary to fund the plan.  But no one can know the economic future, MERS points

out, and history has in recent memory known downturns in real estate values.  Therefore, MERS

concludes, a balloon plan can never be shown to have the "reasonable likelihood of success" that

case law has adopted as the measure of feasibility in § 1326(a)(6).[8]

Section 1325(a)(6), the feasibility requirement, permits confirmation of a Chapter 13 plan "if the debtor will be able to make all payments under the plan and to comply with the plan." 11 U.S.C. § 1352(a)(6). Case law has not construed this subsection as requiring *certainty* that the debtor will be able to make the plan payments. Rather, as MERS concedes, it requires a showing only that the plan has a "reasonable likelihood of success." *First Nat'l Bank of Boston v. Fantasia (In re Fantasia)*, 211 B.R. 420, 423 (BAP 1st Cir. 1997) (where plan relied on balloon payment, BAP rejected absolute certainty as impossible standard of feasibility and settled instead on reasonable likelihood of success, to be established by definite and credible evidence of ability to make the balloon payment).

In arguing that balloon plans fail as a matter of law, MERS attempts to prove too much. Balloon plans and their circumstances vary widely. Some can pass the test; MERS itself suggests that the present plan would itself be acceptable if its duration were only six months. Though many balloon plans are vulnerable to feasibility challenges, they do not fail this test *as a matter of law*. *Id.* (inclusion of a balloon payment is not dispositive of a plan's feasibility); *In re St. Cloud*, 209 B.R. 801, 809 (Bankr.D.Mass. 1997) (balloon payment plans in Chapter 13 are not per se unfeasible); *In re Wagner*, 259 B.R. 694, 700 (8th Cir. BAP 2001) ("A plan is not infeasible per se because a debtor proposes a lump sum payment."). As MERS concedes, feasibility is a fact-based determination. The Court must examine the feasibility of each balloon

---

[8] Under this same heading of feasibility, MERS also argues that the inherent uncertainty of future real estate values causes balloon plans to suffer two further problems. First, they shift the risk of loss entirely to the creditor; and second, they raise the specter that, should real estate values drop below the amount of the mortgage debt, the debtor will dismiss his "cure and maintain" case and file a new case in which he proposes to cram-down the mortgagee. While these are real concerns, they are not concerns of feasibility but of adequate protection of the secured debt and protection against abuse. The Court will address them separately below.

12

plan on its own facts.

The Court finds that he present plan is feasible. It can succeed either by refinancing or by sale of the property. Ref nancing, the more difficult option, requires the confluence of several factors: the Debtor must ach eve regularity in his plan and mortgage payments for a period of twelve months before the te m of the plan; his wife must find full-time employment at a suitable salary; interest rates must nc t increase prohibitively over the term of the plan; and real estate values must not drop prohib tively. None of these is assured, but each separately, and all together, are reasonably like y to occur; that is, refinancing is feasible. Sale of the property, which is the Debtor's fall-bε ɔk option, requires only a willing buyer at a price in excess of the $670,000, which would covι r the $638,441.93 necessary to pay off the mortgage and plan and pay a broker's five percent s ιles commission. Even allowing for substantial slippage in real estate values, this is well wi hin the realm of feasibility.

## 4. **Curing of Defau t and Maintenance of Payments under § 1322(b)(5)**

Notwithstanding § 1 ·22(b)(2)'s prohibition against a plan's modifying the rights of those secured claims secured only by a security interest in the debtor's principal residence, "a plan may . . . provide for the curing oʃ any default [on such a claim] within a reasonable time and maintenance of payments w ιile the case is pending." 11 U.S.C. § 1322(b)(5). MERS contends that, as a matter of law, a ba loon payment cannot satisfy the requirement that the curing of the default occur within a reasoι able time. MERS further contends that timing of the cure payments in this plan, where the Debtι r would make "minimal" payments for thirty-five months and pay the bulk of the arrearage onl ⁄ in the thirty-sixth month, is prejudicial and inequitable to MERS and therefore does not satisʃ ⁄ requirement of cure within "a reasonable time." MERS does not

explain how the plan is prejudicial or inequitable.

The Court first rejects the argument that balloon payments, as a class, cannot satisfy the cure-within-a-reasonable-time requirement. Again, balloon plans and their circumstances vary widely. "A reasonable time" is a discretionary standard that will vary from case to case, according to the particulars and circumstances of the plan.[9] It simply is not the case that no plan that relies in part on a balloon payment to cure a default can conceivably satisfy the requirement of "reasonable time." Balloon plans do not fail the reasonable time test as a matter of law.

This leaves the question of whether the proposed cure period in this case is unreasonable. The Court holds that it is not unreasonable and, in doing so, is guided by the following considerations.

First, the plan effectuates a cure just as quickly as the Debtor and his wife can feasibly effectuate one. They have submitted all their disposable income to the plan. And they propose to refinance the property by the thirty-sixth month of their plan because the option of refinancing is not likely to be available to them much sooner than then. Without question, the plan represents the Debtor's best effort.

If the Debtor and his wife were to fund the plan, or even just the arrearage, entirely from future earnings (as MERS suggests they should), the process would be considerably longer. The arrearage in this case is especially large and the total cost of the plan substantially larger. Even with considerably more disposable income than they presently have, the Debtor and his wife could not cure the arrearage and fund the plan exclusively from such disposable income in less

---

[9] The Bankruptcy Code provides no guidance as to what constitutes a reasonable time to cure a default on a residential mortgage. Nor has the case law settled on a widely-accepted definition. See Keith M. Lundin, CHAPTER 13 BANKRUPTCY, 3D ED. § 133.1 (2000 and Supp. 2004).

than the maximum sixty months that the Code affords Debtors "for cause." 11 U.S.C. § 1322(d).

By contrast, the present plan provides for full cure within thirty-six months.

I am not swayed by the fact that the Debtor and his wife could have elected to sell the

property immediately in order to fund a balloon payment in the early months of the plan. They

want to keep their home. This is understandable and not unreasonable; the principal attraction

and purpose of Chapter 13 is that it enables debtors to do just this. The option of an immediate

sale would undercut the plan and its legitimate purpose. Accordingly, I hold that where a debtor

has a justifiable interest in keeping his or her home, a cure period is not rendered unreasonable

solely because a cure could be effectuated sooner through an immediate sale. For these reasons, I

am satisfied that the time to cure under the plan is no longer than is necessary to effectuate a

cure.

Second, MERS's secured claim is adequately protected during the term of the plan by a

sizable equity cushion and by the right of MERS to seek relief from stay during the pendency of

the case should circumstances change. The size of MERS's equity cushion is likely to increase

postpetition with appreciation in the value of the property and with modest reduction in the debt.

Also, the Debtor's obligation to remain current on postpetition real estate taxes should prevent

erosion of MERS's cushion by a senior statutory lien. Therefore, although no one can predict

with certainty the future value of this property, MERS is adequately protected: the length of the

cure period, and the delay occasioned thereby, do not jeopardize the mortgagee's ability to

recover the arrearage (or the debt as a whole) by recourse to its collateral.

Third, and contrary to what MERS suggests, the duration of this plan does not shift all

risk of loss to MERS. In view of the substantial equity that the Debtor and his wife now have in

the property (which equity is fully exempt under the Massachusetts homestead exemption), the

risk of loss here is borne more heavily by the Debtor and his wife than by MERS. Their equity

would be first to disappear should real estate values drop over the term of the plan. And the

postpetition income that they are devoting to the plan and to the servicing of the MERS loan

postpetition is income they would be expending otherwise were they not betting on the success of

this plan. MERS may take little comfort in this, but the Debtors are not embarking on this plan

without risk to value of their own. Insofar as risk and its allocation are concerned, the plan's

thirty-six month cure period does not unreasonably or unfairly impose on MERS.

Fourth, though the proposed monthly payments of $500 will fund only 18.7 percent of the

cost of the plan and (assuming pro rata allocation) of the cure, they are not nominal or

insubstantial.

And fifth, should the plan not succeed, or should the Debtor dismiss this case before

completion of the plan, MERS will retain its mortgage and be able to foreclose. Especially in

view of the impending changes in the Bankruptcy Code, there is little likelihood that a repeat

filing would substantially delay a foreclosure after dismissal. The potential for abuse here is

similarly small.

The Court concludes that in the circumstances of this case, the proposed cure period is

reasonable within the meaning of § 1322(b)(5). The Court is further satisfied that, insofar as

MERS has indirectly challenged the plan on the basis that it does not adequately protect MERS's

secured claim against diminution in value,[10] the Debtor has carried his burden of proof on the

issue and demonstrated that MERS's secured claim is adequately protected.

---

[10] MERS makes no formal objection on the basis of lack of adequate protection, but adequate protection considerations clearly inform its objection under § 1322(b)(5) and its argument in general.

## ORDER

Having now rejected each of the arguments set forth by MERS in support of its objection

to confirmation, the Court hereby overrules the objection of MERS to confirmation of the plan.


Date: October 14, 2005                     *Robert Somma*
                                           Robert Somma
                                           United States Bankruptcy Judge


cc:  John Ullian, Esq., for Debtor
     Deirdre Keady, Esq., for MERS
     Doreen Solomon, Esq., Chapter 13 Trustee